```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA

                        Alexandria Division


DANA W. CUMBIE                    )
                                  )
        Plaintiff,                )
                                  )
            v.                    )    1:06cv940 (JCC)
                                  )
GENERAL SHALE BRICK, INC.,        )
                                  )
        Defendant.                )
```

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendant's motion
for summary judgment.  For the reasons stated below, the Court
will grant Defendant's motion in full.

### I. Background

Plaintiff Dana W. Cumbie is a fifty-five year old male
resident of Prince William County, Virginia, who has lived with
his eighty-seven year old mother for three years.  Defendant
General Shale Brick ("GSB"), through Transportation Supervisor
Matthew Rogos ("Rogos") and his supervisor Ms. Jill Sansoucy
("Sansoucy"), hired Plaintiff as a truck driver in May 2002.
Rogos was responsible for keeping records, processing drivers'
payroll, and disciplining drivers, while Sansoucy served as the
next step higher in the organizational hierarchy.

Plaintiff's responsibilities as a truck driver were to
bring his truck into the yard where it would be loaded with

-1-

different types of brick, mortar, and other supplies; drive his truck to a job site; unload and return.  Compensation depended upon the number of loads delivered each day and destinations to which a driver was assigned.[1]

On January 21, 2003, Plaintiff received his first and only evaluation, scoring him as an "eight" on a scale from one to ten.  Between the time he was hired in May 2002 and his driver evaluation, Plaintiff received three merit awards and bonuses for keeping his truck clean, which were allegedly based upon objective factors applied by Rogos after visually inspecting each driver's truck.

Around early May 2003, Plaintiff discovered a drawing ("Drawing One") posted in public view on the bulletin board outside of Rogos' office, presumably depicting Plaintiff on a Harley Davidson motorcycle (which he rode) with his mother as the passenger.  Plaintiff, feeling that the drawing was a personal attack, reported this picture to Rogos, who admitted that the drawing was offensive.

On May 22, 2003, Plaintiff returned to the yard after his shift, only to discover that numerous drawings depicting the same caricature in Drawing One had been posted around the warehouse.  The picture ("Drawing Two") depicts Plaintiff on a

---

[1]If a driver received more than three jobs in a day, the driver received 150% of the normal zone pay for any jobs over the three.  As to destinations, drivers received high compensation for jobs that required greater driving distances.

boat with the caption "Three men and 1 [one] boat . . . what could be better?"  Another caption points to Plaintiff's backside that reads "butt hurts" with a fifty-five gallon drum of Preparation H floating nearby in the water.

After discovering this picture, Plaintiff entered the break room and noticed numerous drawings scattered throughout the room, by the entrance, at the coffee pot, and by the refrigerator.  Some were identical to Drawing One and Drawing Two, while others represented two new drawings.  Of the new drawings, the first ("Drawing Three") depicted the same caricature, presumably Plaintiff, again on his motorcycle, hauling a trailer in a direction opposite to that indicated on a sign with an arrow reading "TO JOB."  The second ("Drawing Four") shows the same caricature, again presumably Plaintiff, on a couch next to what appears to be a "penis pump," and a caption above the television reads "And now, the 'Dixie Chicks.'" The man lying on the couch is salivating while sleeping, with a caption above his head that reads, "Huh? What? Chicks with Dix?"

Upon returning to work the next morning, May 23, 2003, Plaintiff found the drawings still posted.  Plaintiff removed the pictures and showed them to an employee that had replaced Rogos while he was on his vacation.  On May 27, 2003, Plaintiff visited the Prince William County Human Rights Commission ("PWCHRC") and was advised to start keeping a journal.

On May 28, 2003, Rogos called Plaintiff into a conference room for a meeting with him and Sansoucy. Plaintiff showed Rogos the drawings, and explained that he believed the drawings were of him, and attacked him personally. Rogos admitted the pictures resembled Plaintiff and stated that he would be offended. Later that day, Sansoucy informed Plaintiff that Defendant GSB took the matter seriously, despite their questioning the authenticity of the drawings and whether any employee was responsible for posting them. Because of the tone taken by Rogos and Sansoucy, Plaintiff returned to PWCHRC that day with copies of the drawings and filled out a complaint intake questionnaire.

Vice President of Human Resources Ken Parham instructed Sausoucy to investigate the matter. Rogos spoke with other GSB employees, most of which admitted to viewing the drawings, but none admitted to creating them. On May 29, 2003, at 2:30 pm, Rogos told Plaintiff to prepare a written statement regarding the drawings. Plaintiff contacted PWCHRC, as he believed he should have a lawyer present. After the phone call, Plaintiff informed Rogos that he contacted the PWCHRC about the drawings. At 4:30, a meeting was held where all drivers were required to re-sign the GSB No-Harassment Policy.

On Monday morning, at 10:30 am on June 2, 2003, Rogos informed Plaintiff that he was being suspended for two days

-4-

without pay for failing to report a workman's compensation claim in a timely manner.[2]  The letter informing Plaintiff of this suspension was dated May 29, 2003.  This same day, Plaintiff informed Sansoucy that he believed Rogos suspended him in retaliation for complaining about the drawings.

One month later, on June 30, 2003, Plaintiff contacted Rogos to file a workman's compensation claim for a knee injury that had occurred on April 28, 2003 while getting out of his truck at work.  On July 14, 2003, Rogos informed Plaintiff that he was being suspended for three more days for failing to report the April 28 workman's compensation claim in a timely manner. These two suspensions were the only times Plaintiff was disciplined while at GSB.

After May 2003, Plaintiff never received any more awards or bonuses for keeping his truck clean, although he maintained it in the same condition.  Between May and July 2003, Plaintiff complained to Rogos that he was receiving fewer and shorter daily loads, and thus, less pay.  On July 21, 2003, Rogos told Plaintiff that he needed to report to Altmed Medical Center to receive an alcohol test.  Plaintiff complied and the test was negative.

---

[2]On May 12, 2003, during a casual conversation with Plaintiff, Rogos learned that Plaintiff had been involved in an accident during the previous February, where he was struck by a forklift.  At the time of the accident, Plaintiff did not believe the injury was anything but an everyday bump or bruise.

In August 2003, Plaintiff took a leave of absence pursuant to the Family and Medical Leave Act to care for his ailing mother.  In October 2003, GSB mailed Plaintiff his personal effects, despite never requesting that they be sent to him.  When applying for credit to purchase a new motorcycle, a salesperson informed Plaintiff that GSB no longer employed him.

On August 16, 2006, Plaintiff filed a complaint in this district alleging a Title VII retaliation claim and a Family Medical Leave Act claim.  On May 11, Defendant GSB moved this Court to enter summary judgment on both counts, and on June 15, 2007, Plaintiff conceded to judgment on his FMLA claim and request for Back Pay.  Therefore, the only matter before the Court is Defendant's motion for summary judgment as to Plaintiff's claim of retaliation.

## II. Standard of Review

Summary judgment is appropriate only if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Applications & Serv., Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996) (citations omitted).  The party seeking summary judgment has the initial burden to show the absence of a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A genuine issue of material

-6-

fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III. Analysis

Defendant moves this Court to enter summary judgment against Plaintiff on his Title VII retaliation claim.  For the reasons below, the Court will grant Defendant's motion.

A.  Whether Plaintiff satisfied Title VII's Exhaustion Requirements

Defendant first argues that Plaintiff's retaliation claim is barred for his failure to exhaust administrative remedies.  "Before filing suit under Title VII, a plaintiff must exhaust [his] administrative remedies by bringing a charge with the EEOC." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 237 (4th Cir. 2000).  Plaintiff signed his Charge of Discrimination on September 4, 2003.  On the two-page form, Plaintiff clearly indicates his claim that he has been the victim of retaliation by placing a large "X" beside the field marked "Retaliation." On the second page, Plaintiff fills the entire space allocated to discuss the issues and allegations of discrimination, describing the instances involving the aforementioned drawings in his work environment.  Plaintiff does not specifically allege the instances of retaliation for which he is currently seeking relief.

-7-

Defendant argues that, since Plaintiff did not allege the specific instances of retaliation on the form, he did not exhaust his administrative remedies.  As it appears, Defendant effectively asks this Court to apply the same level of scrutiny to an EEOC charge as it does to a Complaint.  Defendant makes this request despite being fully aware that: "[c]laims set forth in a Title VII complaint are cognizable so long as they are like or reasonably related to the allegations of the [EEOC] charge and grow out of such allegations." *Johnson v. Quin Rivers Agency for Community Action, Inc.,* 140 F. Supp. 2d 657, 663 (E.D. Va. 2001)(cited by Defendant).

Plaintiff's allegations included in his EEOC charge are the specific underlying events out of which Plaintiff's claim of retaliation arises.  That is, Plaintiff complained about the drawings, and he was subsequently retaliated against for this conduct.  Supporting this conclusion is the fact that Plaintiff placed a large, bold "X" in the field indicating retaliation. Since Plaintiff's claim of retaliation is reasonably related and grows out of his EEOC charge, it is not barred for failure to exhaust administrative remedies.

B.   Whether Plaintiff has established a *prima facie* case

To establish a *prima facie* case of retaliation, Plaintiff must produce evidence from which a reasonable jury could find (1) that he engaged in protected activity; (2) that

his employer took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action. *Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001)(retaliation under Title VII). Defendant argues that Plaintiff's claim fails on all three *prima facie* requirements, however, since this Court finds that Plaintiff fails to provide sufficient evidence that he engaged in a protected activity, the Court will grant summary judgment on this ground, and need not address Defendant's arguments in the alternative.

        Protected activity includes the filing of a charge or complaint regarding an employer's alleged unlawful practices, as well as engaging in other activity intended to oppose an employer's discriminatory practices. 42 U.S.C. § 2000e-3(a). However, to receive Title VII's retaliation protections, the employee must have had a reasonable belief that the underlying actions were unlawful. *EEOC v. Navy Federal Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005).[3]  It is undisputed that Plaintiff went to PWCHCR and completed an intake questionnaire complaining of sexual harassment and a hostile work environment.  Such

---

        [3]Because the analysis for determining whether an employee reasonably believes a practice is unlawful is an objective one, the issue becomes one that may be resolved as a matter of law. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001)(per curiam)(resolving the objective reasonableness of Title VII plaintiff's beliefs through the summary judgment procedure).

-9-

activity is protected, so long as Plaintiff had a reasonable belief that the underlying actions complained of were unlawful.

To be unlawful, the practices opposed may include "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Such discrimination includes maintaining a sexually hostile work environment, just as Plaintiff alleged, which is a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21 (1993).

The drawings posted in Plaintiff's workplace--while offensive, tasteless, and insensitive--could not lead a person to reasonably believe that a Title VII violation has occurred. Drawings One and Three, although juvenile and potentially hurtful, have no sexual connotations at all. Drawing One derides Plaintiff as a "Momma's Boy" and Drawing Three mocks Plaintiff for his work ethic and his affinity for motorcycles. Drawings Two and Four are a little more disconcerting, but not significantly. Drawing Two attempts to inappropriately ridicule Plaintiff as gay, and Drawing Four jests that Plaintiff is impotent and somehow interested in transsexuals. Although

-10-

involving sexual references, the drawings do not appear to be so intimidating or insulting of Plaintiff as to be discriminatory.

Instead, the Court finds the postings boorish and juvenile, nothing more, and insufficient to rise to the level of leading a person to reasonably believe they are so severe as to be abusive and alter the conditions of employment, constituting a sexually hostile work environment. *See Hartsell v. Duplex Products, Inc.,* 123 F.3d 766, 773 (4th Cir. 1997). Since the conditions of which Plaintiff complained were insufficient to reasonably lead a person to believe that a Title VII violation had occurred, Plaintiff has not engaged in a protected activity, and therefore does not receive the benefit of Title VII's protections. *See, e.g., Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998)(Title VII does not prohibit all . . . harassment in the workplace); *Hopkins v. Baltimore Gas and Electric Co.,* 77 F.3d 745, 747-48 (4th Cir. 1996). Accordingly, his retaliation claim must fail for failure to establish a prima facie case, and Defendant's motion for summary judgment will be granted.

### III. Conclusion

For the foregoing reasons, the Court will grant

Defendant's motion for summary judgment in full.  An appropriate

order will issue.

June 18, 2007
Alexandria, Virginia

_____/s/_____
James C. Cacheris
UNITED STATES DISTRICT COURT JUDGE